EcjWshrS

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                   v.                      14 CR 243 (JSR)
                                            Sentence
5

6   CHARLIE SHREM,

7
                        Defendant.
8   ------------------------------x

9
                                            New York, N.Y.
10                                          December 19, 2014
                                            2:30 p.m.
11

12  Before:

13                      HON. JED S. RAKOFF,

14                                          District Judge

15
                            APPEARANCES
16
    PREET BHARARA
17       United States Attorney for the
         Southern District of New York
18  SERRIN A. TURNER
         Assistant United States Attorney
19
    BRAFMAN & ASSOCIATES, P.C.
20       Attorneys for Defendant
    MARC A. AGNIFILO
21
    ALSO PRESENT:  Gary L. Alford, IRS
22

23

24

25

EcjWshrS

1          (Case called)

2          MR. TURNER:  Good afternoon, your Honor.  Serrin

3     Turner, for the government.  With me at counsel table is

4     Special Agent Gary Alford from the Internal Revenue Service.

5          MR. AGNIFILO:  Good afternoon, your Honor.  Marc

6     Agnifilo, and with me is Charlie Shrem.  Good afternoon, your

7     Honor.

8          THE COURT:  Good afternoon.  We're here for sentence.

9     The first order of business is to calculate the Sentencing

10    Guidelines, which the probation office calculates as a total

11    offense level of 25 and a criminal history category of I,

12    which, if we were only looking at the guidelines, would lead to

13    a suggested prison term of 57 to 71 months.  However, there is

14    a statutory maximum of 60 months, so the guideline range is 57

15    to 60 months.  Any disagreement with that?

16         MR. TURNER:  No, your Honor.

17         MR. AGNIFILO:  No, your Honor.

18         THE COURT:  Very good.  Now, of course, what that

19    shows, among other things, is what this Court has frequently

20    had occasion to respectfully suggest, which is that the

21    guidelines are arbitrary, irrational, and at times downright

22    silly.  For example, in this very case, the guidelines would

23    recommend a sentence even greater than Congress has given as

24    the maximum sentence.  This is bizarre.

25         I'm required to give consideration to the guidelines,

EcjWshrS

1    I have done so, and find them not worthy of consideration.  I'm

2    very happy now to hear from both sides as to what the sentence

3    should be.  I hope that no one will be so foolish as to refer

4    to the guidelines.

5            Go ahead, Mr. Agnifilo.

6            MR. AGNIFILO:  Thank you, your Honor.

7            Charlie Shrem sits before you, a 25-year-old man.  He

8    committed this offense when he was 22 years old, and I've

9    struggled to put into the right words what, if any,

10   significance that has, and not only the age, the number of the

11   age, but the sophistication, the worldliness, the experience

12   level of the person who committed this crime, and I think it's

13   very important.  It's impossible to pinpoint, to identify, to

14   specify exactly when it is that someone grows up, and that's a

15   shame.

16           For Charlie Shrem and I think probably for most people

17   that time comes when you realize you are responsible for

18   someone else, and I think that realization comes to each of us

19   in an absolutely individualized, unique way.  I think it's come

20   to Charlie Shrem.  I think it's come to Charlie Shrem largely

21   in a business context.  I think it's come to Charlie Shrem

22   while he was an antimoney coordinator for a company called

23   BitInstant that he founded with another founder, and it

24   certainly came to him a little too late in the game for him,

25   unfortunately, which is why we're sitting here discussing these

EcjWshrS

1    sorts of nonlegal concepts at his sentencing.

2              He started BitInstant when he was 21, and he had a

3    series of e-mail communications with someone who was known to

4    him as BTCKing, now known to all of us as Mr. Faiella, when he

5    was 22.  And what ends up being the best evidence in the

6    government's case and, quite frankly, overwhelming evidence of

7    Mr. Shrem's knowledge that Mr. Faiella, known to him as

8    BTCKing, was involved in trying to sell bitcoins to people who

9    would want to buy drugs on the Silk Road, all starts really

10   with a -- and I don't know that I'd say this in every

11   courtroom, but I can say it here, and I hope I say the word

12   correctly -- puerile, boyish, stupid, intemperate, foolish,

13   exchange, where they're pointing at each other.  You can hear

14   it, and this is one of the reasons e-mails are so terrible,

15   one, because they last forever, and, B, because I think people

16   act inconsistent with their true nature and say things more

17   directly than they might say if you actually were looking at

18   someone's face.  And what they basically are doing to each

19   other is Faiella is saying, well, you're stealing, if you don't

20   let these transactions go through, you're stealing my clients'

21   money.  And Shrem says, oh, yeah, you're selling drugs on the

22   illegal Silk Road.

23             Now, when I got this case about maybe ten months ago,

24   you don't know where the case is going to go, I looked at the

25   e-mails, I said, Charlie, you have to plead guilty.  I mean,

EcjWshrS

1    there's not a lot here.  There are all these wonderful

2    subtleties in the case, and there might be some really

3    interesting arguments and, Lord knows, we couldn't have a

4    better judge than Judge Rakoff for interesting, weighty

5    arguments, I said, but you've done everyone in a sense a favor

6    by taking a razor-sharp spotlight and going through all the fog

7    and making it as clear as a bell you know for the rest of time

8    that Faiella's selling bitcoins on the Silk Road, the illegal

9    Silk Road; I think he even underlines it, and that's the heart

10   and soul of this case.

11        Now, what does it mean?  It means a few things.  It

12   means for Charlie Shrem that he's having this puerile argument

13   while he's the antimoney-laundering coordinator, and that's why

14   he committed a crime.  I mean, at that very moment, having this

15   discussion, and then having the transactions consummated was

16   undoubtedly a crime, and one that he pled guilty to.  But how

17   could this be?  Why would this happen?  And this case has

18   presented a very unusual opportunity, I think, to your Honor in

19   a proceeding that we all know what we're referring to.  Charlie

20   Shrem is a young man.  He's growing, he's learning things.  His

21   life is changing.  He's trying to figure out where in the world

22   he fits in.  He's trying to figure out where in his own family

23   he fits in.  He's trying to figure out where in his religion

24   that he grew up with he fits in.

25        Again, none of this is to say that he didn't know he

EcjWshrS

1    was doing wrong.  He knew he was doing wrong.  But there's

2    something that is missing in the equation, which is life

3    experience.  Knowing is the first step.  Knowing is the seed of

4    something that we plant in the ground.  We know the law when we

5    graduate law school, but we wouldn't try a racketeering case

6    after we pass the bar because we would make 500 mistakes during

7    the case.  And so why don't we make 500 mistakes?  I don't know

8    that we get new information.  I don't know that we know

9    specific things, but we know somehow how to move through the

10   world.  We know the problems and we know the problems because

11   of all the times I think, and I'm speaking mostly of myself as

12   a lawyer, all the times we screwed up, all the times we made

13   mistakes and all the lessons we've learned, and that's how we

14   get better and that's how we grow.  It's information.

15        And he did know better, he should have known better.

16   He should have stopped it dead in its tracks.  He didn't,

17   because they were getting a decent amount of money from

18   Faiella.  I think over the course of 11 months they profited

19   almost $15,000, which is, I think, significant enough to

20   BitInstant for where they were as a start-up that he stayed in

21   this.  But all of this is being done, these are the decisions

22   of a 22-year-old, not to say they're not wrong, not to say that

23   somehow they escape the prism of moral judgment, they have all

24   of those things, but in terms of blameworthiness, I think

25   that's all significant.

7

EcjWshrS

1          So what was Shrem doing?  Shrem was essentially

2    helping someone who was helping someone buy illegal drugs or

3    what's most likely, most overwhelmingly likely illegal drugs.

4          Now, there are a couple of things that are

5    significant.  It's significant, though I suggest certainly not

6    dispositive, that if they're on a side, they're on the side of

7    someone who is buying drugs.  The law recognizes a distinction,

8    I submit, historically, federal systems, state systems, between

9    people who sell drugs and people who buy them.  I mean, Faiella

10   is probably the biggest customer he had.  But even there, he

11   had a number of customers who were buying personal use

12   quantities, probably personal use quantities of some type of

13   illegal drug most likely.

14         Silk Road, I don't know what the percentage is and I'm

15   certainly not going to spar with AUSA Turner on this, I don't

16   know if it's 80 percent, 90 percent, it's mostly a drug site

17   and so whether it's 100 percent or something less is, I guess,

18   neither here nor there.  This is most likely what was going to

19   be happening.  It could have been marijuana, it could have been

20   cocaine, it could have been heroin, it could have been hash.  I

21   don't know what it was, because nothing's actually happened.

22   But at the end of the day I think it's significant that

23   Mr. Shrem is aligned, with a few intermediate steps, with

24   someone who is buying drugs, not someone who is selling drugs.

25   He's not laundering money of a drug seller.  I think that while

EcjWshrS

1   this statute and certainly the money-laundering statute as well

2   would be applicable to someone who is laundering drug proceeds,

3   I submit to your Honor that is an activity of a different

4   nature than what we have here.  It's a different nature because

5   I think of the evils that drug selling has presented, the

6   desperation with which I think our country and other countries

7   have tried to prevent the laundering of those drug proceeds,

8   and I think it's worth noting here that Section 1960, the

9   statute that Mr. Shrem pled guilty to, I believe was passed in

10   1992.  It wasn't used a lot and it seems to have had no teeth

11   until the Patriot Act added some provisions to it which I think

12   are relevant here.

13          Now, what are we concerned about with the Patriot Act?

14   We're concerned, I think, that people are going to send money

15   from one place to another and that that money is going to be

16   used, I guess, for terrorism, I mean, in a post-9/11

17   environment.  But as your Honor knows, being one of the

18   scholars of the RICO statute, where a statute begins doesn't

19   necessarily bear resemblance to where it ends.  There's no

20   doubt that Mr. Shrem is comfortably within the purview of 1960,

21   but I don't think at the end of the day that he should be

22   sentenced in accordance with someone else's conduct who also

23   would be within the purview of Section 1960.

24          The second point that we discussed in our brief, and I

25   know your Honor's read everything and I'm not going to go

EcjWshrS

1    through it in great detail, but I think it's a point worth

2    highlighting in a somewhat different way, almost 50,000

3    customers processed orders through BitInstant, and Mr. Shrem

4    violated his duties as the antimoney-laundering coordinator

5    with only Mr. Faiella.  I think that's very significant.  I

6    think what's also significant, and I'm not here to say bad

7    things about Mr. Faiella, who is being sentenced at another

8    time, but I think it's significant that Mr. Faiella continued

9    the activity, whatever it was that he was doing, even after he

10   and Mr. Shrem parted ways.  And I think it's highly significant

11   and goes to the heart of fashioning a fair and reasonable

12   sentence that, after parting ways with Mr. Faiella, Mr. Shrem

13   never did anything like this again.

14        In fact, what he did around the time that Faiella was

15   moving away from him, and it's really just circumstance, I

16   mean, and he was contacted by the Department of Homeland

17   Security, the Department of Homeland Security sent an e-mail to

18   the general BitInstant mailbox.  Mr. Shrem answered the next

19   day.  The Department of Homeland Security had a number of

20   questions about the role of bitcoin and how bitcoin could be

21   used by people looking to launder money or break the law in

22   different ways, and Mr. Shrem had a number of meetings, I think

23   it was three, with, I think it was a total of four agents for

24   the Department of Homeland Security.  We go through this in our

25   sentencing memo.  He met with the Manhattan D.A.'s office who

EcjWshrS

1    also had questions about bitcoin, and that's before he got

2    arrested here.  This is after the conduct, the offense conduct,

3    and before he got arrested here, at the same time that he's

4    never doing anything like what he did with Mr. Faiella.

5              Now, the prosecutor's going to point out that Faiella

6    and Shrem parted ways for reasons unrelated to Mr. Shrem or

7    Mr. Faiella.  There were issues, I guess, with another company

8    that caused that to happen.  I think what is significant,

9    though, is that if it were really about money for Mr. Shrem, if

10   Mr. Shrem was looking to make money from Silk Road, there's an

11   exchange that's in the presentence report and referred to in

12   our sentencing memo as well where the cofounder of BitInstant

13   at one point says to Mr. Shrem why don't we just dispose of

14   Mr. Faiella and we could essentially advertise on the Silk

15   Road, too, and Mr. Shrem doesn't take the cofounder at that

16   offer.  They never advertise on the Silk Road.  They never move

17   toward the Silk Road.  They don't do anything with regard to

18   the Silk Road other than their contact with BTCKing, with

19   Mr. Faiella.  And so when I say that his conduct is

20   aberrational, I recognize that it took place over the course

21   of, I think it's about ten or 11 months, and that's certainly

22   true, but I don't know that that means it's not aberrational in

23   the 3553 sense in terms of the quality of the offense conduct

24   itself.  It's not something that Mr. Shrem was looking to

25   promote.  The not something that Mr. Shrem was looking to find

EcjWshrS

elsewhere.  When Mr. Faiella went his own way, Mr. Shrem

dropped it, never again tried to make inroads on the Silk Road,

and I think that's significant.  And I think it's significant

that for, I think it's a period of 15 months after Mr. Shrem

stops dealing with Mr. Faiella, there are no other AML

violations leading up to his arrest in this case.

        I want to talk just for a second about general

deterrence, because the government makes a big, fairly big

issue of general deterrence, and there's three things that I

want to say about general deterrence.  I guess I'll start with

the boldest one that I want to say first.  General deterrence

is recognized by 3553; it's something that's in there.

However, I think in order to have the concept of general

deterrence administered ethically, and I'll say in a minute

what I mean by ethically, I think it has to be diluted by other

aspects of 3553.  If Immanuel Kant was standing here, and I

think Immanuel Kant is standing spiritually in every federal

courtroom during sentence, he would say we can't do this.  We

can't use people as means to send messages to other people.  We

can't use Charlie Shrem as a means to send a message to some

unknown person somewhere in the world so that they don't do

something wrong with bitcoin or money transmission.  It's not

right.  It violates the categorical imperative.  It's something

that, we shouldn't treat people as means for any particular

end.

EcjWshrS

1          So to the extent that we can even consider general

2     deterrence, and it's an age-old proposition, and I'm not going

3     to sit here and say anything other than that, I think it has to

4     be tempered by other aspects of 3553.

5          In preparation for today, I have had reason to look at

6     a number of different studies.  There is a very thorough study

7     by Cambridge University that they did for the Home Office in

8     England, and the conclusion of the study is that it's not so

9     much the length of the sentence as much as the certainty of

10    being caught that is really the deterrent quality.

11         THE COURT:  I think this is more interesting, to be

12    frank, because Immanuel Kant, huge figure though he is in the

13    history of the world, was not, so far as I can recall, a member

14    of Congress, and Congress has decreed that general deterrence

15    will be taken account of, and that was hardly unique to

16    Congress.  It had been part of the Anglo-American legal

17    philosophy for quite sometime.  What is much more relevant is

18    what do we need in terms of punishment to bring about general

19    deterrence.  The difficulty, of course, is that designing

20    studies that can really determine this is not easy.  I'm

21    interested in the study that you're in the process of

22    describing.  I'll be interested if the government has any

23    contrary study they want to bring to my attention.  I have

24    read, as I'm sure most of the judges in this court have read,

25    studies that are all over the lot, and that is because there

EcjWshrS

1    are so many parameters involved and it's so difficult to design

2    a statistically meaningful study in this area that to some

3    extent one has to rely on intuition and guesswork and

4    experience because the studies do not give us a definitive

5    answer.

6              On the other hand, I think it is fair to say that

7    there are at least a great many studies that suggest that there

8    is not a huge difference between the general deterrent effect

9    of long prison terms as compared to shorter prison terms, even

10   those studies being criticized by others who take a different

11   point of view, and the study you're about to be telling me

12   about, which I'm not personally familiar with, but I've seen

13   other similar studies which are really a subset of that view

14   and say that it's the likelihood of being caught.  But why is

15   the likelihood of being caught a deterrent at all?  It's

16   because of fear of prison.  If you knew for a fact that if you

17   were caught you would not do any prison time, that it was set

18   in stone that there would be no prison time whatsoever, the

19   fact that you might be caught would not have, one think, much

20   of a deterrent effect.  It would become just another cost of

21   doing business, so to speak.  So I think the better argument is

22   that short prison time has as much of a general deterrent

23   effect as long prison time, or something along those lines.

24             MR. AGNIFILO:  I think the other thing that we have in

25   this case that is a mighty measure of punishment is an

EcjWshrS

```
 1    agreed-upon forfeiture order of close to a million dollars.

 2              THE COURT:  Yes.  Thank you for reminding me of that.

 3    I'm going to sign that right now, so we get that out of the

 4    way, and give it to my courtroom deputy to docket.

 5              Go ahead.

 6              MR. AGNIFILO:  And I think the reason that that is a

 7    powerful general deterrent, especially in the bitcoin space,

 8    especially with companies like BitInstant, other bitcoin

 9    processers, is because of the way the law works.  In other

10    words, it doesn't matter that Charlie Shrem made less than

11    $15,000.  The truth is that in terms of the funds that are

12    deemed illicit under the law, that number is close to a million

13    dollars, so in terms of forfeiture, and until one becomes

14    comfortable with this concept or I should say familiar with

15    this concept, it's almost counterintuitive, how can he forfeit

16    money that he undoubtedly didn't make.

17              THE COURT:  Also, if you will, another

18    counterintuitive aspect of it is that it drives the sentencing

19    guideline calculation in this and a great many cases, which has

20    been greatly criticized by many, many observers who would

21    question whether sentencing is about the amount of money

22    theoretically involved, often not received by the individual

23    defendant, as opposed to things like what kind of human being

24    is this.

25              MR. AGNIFILO:  Agreed, and that's right.  But I think
```

EcjWshrS

the way that it functions here as a deterrent, the deterrent

value, is when people know and people know and will know and

will know more and more, that this particular crime doesn't

pay, literally doesn't pay, and that they will be on the hook

in a very real sense to the United States Government for

whatever amount of money passes through their business that's

illicit in nature and that there will be a forfeiture judgment

that is collectible for, I don't know if it's 20 years or

whatever the lengthy period of time, that's a mighty factor.

That's not an incidental factor.

THE COURT:  It's not an incidental and I query how

much deterrent effect that it has.  You're arguing that it has

substantial deterrent effect.  The sad truth is that the

government often is not able to collect what on paper it is

entitled to forfeit, and I think if the assumption of all of

this is that word gets out, so in your argument word gets out

that you could face a forfeiture considerably greater than the

amount of money you realized, word may also get out that, in

fact, the government frequently is unable to collect that

money.

MR. AGNIFILO:  I think though, with this group of

people, I mean, because what happens, I think, in certain

realms of certain types of offenses, the defendant doesn't make

the money on paper the way I think, if Mr. Shrem is permitted

to do so, he's going to be a businessman of some sort --

EcjWshrS

1           THE COURT:  Right.

2           MR. AGNIFILO:  -- maybe in the bitcoin realm, maybe in

3    some other realm, I anticipate he's going to have verifiable

4    income.  I don't think he's going to be off the financial chart

5    like in the case of some defendants who have large forfeiture

6    orders because they're not going to have traditional jobs where

7    they're showing identifiable paper income, whether because they

8    go back to some sort of illegal activity if they're in the

9    illegal drug business of certain natures, we'll never know what

10   money they're making.  I understand your Honor's point

11   completely, but I think for people like Mr. Shrem who are

12   looking to make their way as a normal, typical, legitimate

13   businessman, I think the government could stand in better

14   stead.

15           THE COURT:  All right.

16           MR. AGNIFILO:  In addition, I think the assumption of

17   a federal felony, especially a felony of this nature, has dire

18   consequences.  And in essence, I think what's happening and why

19   I keep coming back to the term "quality" of this is because in

20   one fell swoop, Mr. Shrem goes from someone who is on a certain

21   road in life and is able to do certain legitimate business

22   things and, all of a sudden, he has a felony and a conviction.

23   It makes it harder to have bank accounts.  It makes it harder

24   to do a lot of things.  It makes it harder to go to certain

25   countries.  It makes it harder to rise to a certain level in

EcjWshrS

1    business.  It's essentially signing on to these grave

2    limitations, and, yes, there is something tangible and scary

3    and forboding about prison, which is why every lawyer who has

4    ever stood at this podium is looking for something different

5    undoubtedly, but ultimately, I think that the general

6    deterrence has to be viewed alongside where Mr. Shrem is now,

7    where he was when he committed this crime.  And as your Honor

8    famously said, and this is probably one of the few sentencing

9    memos I didn't put this in because it's your Honor's quote, and

10   I didn't write it down, but I think I remember it about right:

11   If ever there was a time to look at the general good works of

12   someone and place it alongside the misconduct, it's at

13   sentencing.

14        One of the hard things for Charlie Shrem is he's a

15   young man.  I don't think we're going to be here 20 years from

16   now.  If we're here 20 years from now, he'd have 25 years as an

17   adult to have amassed good works so that I could come here and

18   say, your Honor, look, he not only helped the boy who lost his

19   leg in a terrorist attack, which he did do as a high school

20   student, he did 75 other things because of all the time he had

21   as an adult moving through the world.

22        I guess what I'm about to do is I'm about to ask your

23   Honor almost to turn your quote upside down and to trust that

24   he's going to do these things, to sentence him for what I think

25   he can do, to sentence him for where I think he is going.

EcjWshrS

1          I think what the letters all show, the letters show

2     and what we all know about Charlie Shrem, is there is a fair

3     amount of conflict in his life, where he comes from, where he's

4     going; the role of bitcoin, even in that journey.  But this

5     case is so much about the journey, the movement, the moving

6     from childhood to adulthood of this young man, and some of it's

7     played out right here with your Honor, not only in connection

8     with the case, but just in connection with other things about

9     the family life that your Honor knows about.  And the case is

10    alongside all this.

11         I guess what I'm really asking at the end of the day,

12    I'm asking you to trust him.  I mean, I guess I'm asking you to

13    trust him that he's on a good path.  He stepped off.  He

14    stepped off and he has to be punished for stepping off, but

15    he's on a good path generally.  He's a good man.  He has a good

16    heart.  Everybody loves him and they love him for a good

17    reason.  He's nice to everyone.  He's generous with everyone.

18    There is something bright about him.  I've known him now for 11

19    months.  There is a brightness about him, a positive quality

20    from him.  He's happy, he goes through tremendous turmoil and

21    he's scared to death of this case, and still there's this

22    wonderful life-affirming quality about him and he's going to do

23    great things.

24         What I keep telling him, I say it's good this happened

25    to you, it's good.  I said you're going to be a better person.

EcjWshrS

This had to happen, it had to happen.  And there are certain

aspects about this case that really is God smiling on you and

this had to happen because you will come out of this better,

you'll come out of this being wiser beyond your years.

The crime he committed is so much a product of

youthful bad, bad, bad judgment, and not appreciating the

important role he had, not realizing that he had to grow up

faster than he did because it was no longer about just sitting

at a computer and writing computer code and dreaming of things

that could make the world better.  He had real

responsibilities.  He had tangible responsibilities and he had

to live up to them, and he didn't appreciate it enough.  And

when he had the chance to stop Faiella, he should have.

There's no question, and he didn't because it just was the

mistake of a lifetime.  But that's not him and that's why I

think the aberrational part is the key.  He's not looking to

break the law.  He's looking to do this the right way.  He's

sort of hitched his spiritual wagon to bitcoin.

I don't know much about bitcoin.  You'd be shocked to

know that I still know very little about bitcoin, and I don't

know if it's a good thing or a bad thing, if it was going to go

somewhere or not go somewhere, but I know one thing, because

this is my world, if this gets too close to criminals, it's not

going anywhere, it's just going to die.

In addition to Charlie Shrem, and I think this goes to

EcjWshrS

general deterrence too, and I know that at least for the

purposes of today's proceeding, we're in somewhat of an

adversarial posture, but not generally, I think the United

States Attorney's office for the Southern District has done a

great service to bitcoin.  I think if bitcoin succeeds it's

because of Mr. Turner who has taken the legal out of these

cases because of his office, because the only way that bitcoin

could live up to whatever its true potential is, whatever that

might be, is to get the criminals out of it, to get the

criminals out of it and to vigorously, vigorously investigate

and prosecute violations for the antimoney laundering statute.

I think this case, this very case, is very much part of what is

going to make bitcoin succeed, because if there are too many

criminals involved in it, it's not going to succeed.  I don't

know what else about it could make it succeed or not, but I

know that that will make it fail, and Charlie Shrem knows that,

too.

I know I started by struggling a great deal with

trying to come up with a theme that I thought was the theme in

this case, and he's only a 25-year-old person, so I don't know

that he gets to be a Greek tragic hero, but he hurt himself

tremendously, tremendously.  Because he had it made.  He found

a way.  He has mixed feelings about his small Brooklyn

neighborhood, but he was out, and he was attached to this

wonderful idea and all he had to do was guard it with his life,

EcjWshrS

and he didn't.  The punishment for him, I think, comes in many

forms.  And I don't know that we need a lot more.  I don't know

that we need a jail sentence to send a message to Charlie Shrem

that what he did is bad and wrong and illegal, and I don't know

that we need a jail sentence for the world at large to tell

them that either.  I think the vigorous prosecution by the

Southern District of New York of Mr. Shrem and others, and

there are many others, and the baton has been picked up by

other U.S. Attorney's offices in other districts, they're doing

bitcoin cases as well, and something your Honor said, I think,

comes back to the general deterrence point, which is people

know, if they step off the path with bitcoin, the government's

watching.  This is the big leagues now, this isn't just a

brilliant idea of a bunch of, and I don't mean the term in a

derogatory sense, computer geeks.  This is American business,

and to be American business means something, or at least it

should.  And what it means is that you have to follow the

rules, you're a grown-up.  It's time to get off the computer

screen, alone, and be a grown-up, and I think that message is

loud and clear, and I salute the Department of Justice for

making that message loud and clear.  But I think it's loud and

clear.  I think regardless of whatever sentence your Honor

gives to Mr. Shrem, I think that message is loud and clear.

        In closing, and I'm obviously here to answer whatever

questions your Honor might have, I've appeared before your

EcjWshrS

Honor many times, I know you've read all the materials and the
letters and I don't need to go through it, there are many
people who have faith in this young man, and I believe he has
tremendous potential.  I believe that if he's allowed to do so,
he will do good things with the world.  I think he wants to do
good things with the world.

He wrote a letter to your Honor and there's one
sentence that I read a few times, where he says he was a
visionary, and I thought, huh, he's telling Judge Rakoff he's a
visionary, I think you have to have guts to do great things in
the world, and I think he can do that.  I think he's learned.
I think the message in all of this is loud and clear with him,
and I'm asking your Honor to, I guess, take a chance on him a
little bit.  He's going to do wonderful things and he's not
going to let any of us down.

Thank you.

THE COURT:  All right.  Thank you very much.  Let me
hear from the government.

MR. TURNER:  Thank you, your Honor.  And I will stay
far away from the guidelines, I will avoid any numbers and try
to stick to the adjectives.  I think the adjective you used for
this crime is a serious crime, and it deserves serious
punishment.

The defendant was essentially facilitating drug
trafficking.  He was moving drug buy money.  I know it doesn't

EcjWshrS

1        look like the usual drug-trafficking case.  It's on the other

2        side of the transaction, the purchase side, and that's because

3        of the way Silk Road worked; you had to do some special stuff

4        with your money to actually be able to transact business on the

5        site.  So he's moving money, drug money, not the traditional

6        way.  It's online rather than on the street.  These are digital

7        drug deals, but he's moving drug money nonetheless, and I think

8        that's what's important.

9               We pointed to the amount of money at issue in the case

10       in our sentencing submission not to draw attention to the

11       guidelines and the resulting equation, to draw attention to the

12       amount of drug trafficking that was facilitated, because that

13       is the social harm here, your Honor.  That's what Congress's

14       concern was with this statute.  These are not just bits and

15       bytes that the defendant's moving around on the computer.

16       There is real social harm from the crime.  There are real users

17       often with real addictions that are now able to get addictive

18       substances from dealers all over the world through this site,

19       and there are drug dealers all over the world who are now able

20       to do business this way, and the defendant is indirectly at

21       least helping them grow their business.  So in that sense, the

22       defendant's crime was a serious one, no less so than if it had

23       taken place in real space as opposed to cyber space.

24               Then we get to the point that he was just so young.

25               THE COURT:  On the point you just made, while I do not

disagree at all that it was a serious crime and I do not

disagree that he was facilitating drug trafficking, the point

that defense counsel is making, which you might want to respond

to, was to suggest that nonetheless there is a difference

between, if you will, helping drug addicts to get their fix and

helping drug dealers to promote their product.  The drug

addicts are victims.  They may have contributed to their own

victimization, but they are victims nonetheless and if they are

serious addicts, not all of them are, but if they're serious

addicts, they will do whatever is necessary to get their drugs.

And one can't help but feel in many of those cases that they

should be the object of at least some sympathy.

          The drug dealers, other than those few who are driven

to do so by their own addiction, but I'm talking about the much

more common situation that we see in this court of people who

would never touch drugs in their life, they just know that they

can make millions of dollars by getting others hooked on drugs,

are among the most repulsive human beings that one encounters.

So the argument, maybe it's too fugue, but the argument that I

think your adversary was suggesting was that in assisting the

drug purchasers to get their drugs, while it unquestionably

contributed overall to the drug-trafficking situation, is

perhaps not as morally repellant as assisting the dealers.  So

what about that?

          MR. TURNER:  Your Honor, I think the object of these

1     laws, the money-laundering laws, is to undermine the whole

2     system, the whole cycle of drug trafficking and drug use.

3             THE COURT:  No, that's a different argument.  That

4     goes not to the moral quality of the misconduct.  Congress has

5     said, and has said for a long time, that we're not going to be

6     able to stop drug trafficking unless we get to the economics of

7     it, and that's why you have the forfeiture provisions and

8     that's why you have all these other similar economic laws

9     directed at drug-trafficking proceeds.  We could have an

10    interesting debate, as academics do all the time, about whether

11    that's really worked or not.  That is certainly not for this

12    Court to second-guess.  Congress has decided that this is the

13    path they want to take, and I'm obliged to help them fulfill

14    their mandate, but the argument, at least as I heard it, and

15    I'm not sure what I feel about it, but that's why I wanted your

16    input, was more directed at the moral quality of someone who

17    enters into the facilitation of the nature that Mr. Shrem did

18    and whether it is of a different, albeit still illegal, moral

19    quality than someone who is knowingly assisting the drug

20    dealers in their promotional economic activities.

21            MR. TURNER:  Let me put it this way, your Honor,

22    because I absolutely agree with what your Honor said, that the

23    ultimate harm Congress is trying to prevent here is the harm to

24    the users who are in many ways victims.  But the way that the

25    statutes are trying to do that is by going after the money,

EcjWshrS

like your Honor said.  Here, you have the money that's going to
the drug dealers.  You're trying to stop the money from getting
to the drug dealers in the first place.  In the typical
context, you're trying to stop the drug dealers from hiding the
money after they've already gotten it.  Which is more morally
important or which is more morally problematic if you aid that
activity?  It seems to me they're pretty much the same.
They're all aiding the distribution, the trafficking of drugs
and, at the end of the day, increasing the social harm that
results from addiction and drug use in general.

          I don't think there's much of a moral distinction
there.  I think the distinction generally has to do with the
history of these laws because typically the money is aggregated
at the drug dealer level and that's where you go after it.
Silk Road is a little special because, like I said before, you
have to do something special with the money; you have to
convert it into a special form before you even transact
business with a drug dealer.  And here you had somebody who was
aggregating that money, BTCKing, before it got to Silk Road.
He was a reseller of these bitcoins, and that's why we have the
case we have.

          THE COURT:  All right.  You were about to address the
larger argument, which is essentially that this was an
impulsive kid and, from the Supreme Court on down, we don't
treat kids the same way we treat fully formed adults.

EcjWshrS

1           MR. TURNER:  Right, and obviously this was not a kid.

2      This was a man, a young man, for sure, and his youth is

3      certainly a legitimate factor for the Court to take into

4      account, and it's first offense and that is a legitimate factor

5      for the Court to take into account.  But the Court sees a lot

6      of young men who commit crimes and they exercise bad judgment,

7      for sure.  That's a very common thing we see.  Nonetheless,

8      here, I think there are some factors on the other side.  This

9      was the CEO of a company.  This was someone who appointed

10     himself the compliance officer of that company.  And this was

11     the vice chairman of the Bitcoin Foundation, a foundation that

12     was established to try to repair in some ways the reputation of

13     bitcoin, to show that it had legitimate use, to show that it

14     could be a legitimate currency in the financial system.

15          He was clearly aware of the concerns the government

16     had about the money-laundering dangers that digital currency

17     such as bitcoin posed.  That's partly why, I'm sure, he

18     registered the business with FinCEN to start with.  And by the

19     way, just a quick digression, on the point about whether the

20     defendant passed up the opportunity to advertise his business

21     on Silk Road, obviously he's not going to advertise his own

22     business on Silk Road.  That would draw the attention of law

23     enforcement directly to him rather than a reseller that was

24     working with him.  But this was someone who knew better.

25     Regardless of his age, he knew better.  And he nonetheless

EcjWshrS

carried out this conduct over the course of a year.  He

preached know your customer to the outside world, but then when

it came to regulatory compliance, he looked the other way.

This is someone who had conversations with BTCKing where

BTCKing is saying things like Charlie, I would rather you not

know anything about anything when it comes to me.  He says

fine, I got your back, bro, that sort of thing.  And this

happens repeatedly, again and again.  And he's warned.  He's

warned by his business partner.  He's warned by his cash

processer, and he keeps doing it.  Obviously he didn't make

mountains of money from this activity.  He was struggling; it

was a business that was trying to get off its feet, but

obviously profit motive was the motive there.

          I recognize the youth, but I think there are factors

that cut the other way here so that this is not a momentary

lapse of judgment by a young person.  This is someone who was

immersed in this business world, who was holding himself out to

this business world as an example of what a bitcoin executive

should be all about and then he's subverting all the things

he's talking about in public when he's engaging in these

private transactions within the company.

          Finally, deterrence, and I'm not going delve into a

debate about Immanuel Kant, I'm more of a J.S. Mill man myself,

but I think clearly deterrence is a factor here.  This is a

closely watched case.  The digital currency industry is very

EcjWshrS

1    interested in this case, and defense counsel pointed to the

2    certainty of being caught.

3              THE COURT:  The real question is this.  Let us assume

4    that a court believes that some prison time is appropriate, but

5    then after, in my hypothetical, weighing all the factors other

6    than general deterrence, it finds that the appropriate sentence

7    is X, then the question is should there be an increase above X

8    for general deterrence purposes.  You might not like your

9    adversary's reference to Immanuel Kant, but the point he was

10   making is in a way that's using human beings as a tool to

11   accomplish some social policy, and that is, perhaps, when

12   looked at in that light, somewhat inconsistent with other

13   humanistic notions of justice that pervade our traditions.

14             But I'm putting all that aside.  As a practical

15   matter, what evidence is there that Y amount should be added to

16   X for general deterrence.  The Sentencing Commission has never

17   provided any evidence of that.  Zero.  They choose their

18   numbers for all sorts of, as I've most respectfully suggested,

19   irrational reasons, but that's not part of what they have

20   undertaken, which is really a serious scientific study of how

21   much prison translates into how much general deterrence in any

22   given situation, and in fairness to them it's probably

23   unmeasurable.  Social science is a wonderful thing, but there

24   are limits to what it can do.  Then you have to sort of resort,

25   as most judges do for most purposes, to experience and common

EcjWshrS

1   sense.  But certainly, like any judge, it would be helpful to

2   me to know what additional amount of prison time should be

3   added for general deterrence purposes, if any, to the sentence

4   that this Court would otherwise impose based on the seriousness

5   of the crime and the immorality of its commission.

6           MR. TURNER:  I said I was going to stay away from

7   numbers, your Honor, and I think I'm going to stick with that.

8   What I would say is that if a substantial term of imprisonment

9   is not imposed, I think that would undermine the objective of a

10  deterrent effect here.  I think the dividing line between what

11  the defendant is asking for, which is just probation, and a

12  substantial prison sentence, that's a big one in terms of the

13  deterrent effect that those two different options would have.

14          THE COURT:  Yes.  To take it to extremes, it's

15  undoubtedly the case that there would be some added deterrent

16  effect, though even then one doesn't know how much, but some

17  added deterrent effect if one were to impose a death penalty.

18  Congress hasn't remotely suggested that that's appropriate here

19  and neither have you, but I just give that as an example of how

20  difficult it is to say and how much additional deterrence is

21  achieved, say, by ten years over five years or 20 years over

22  ten years.

23          The American public is a highly moralistic group, and

24  I think it's fair to say and I, like all Americans, can share

25  this, that the people of this country take their morality

1  seriously in an internalized way that is perhaps not true of

2  every culture, but one of the, if you will, down sides of that

3  is almost taking a certain pleasure in high sentences because

4  it reaffirms the moral auditor.  What is going through the

5  minds of people when they read in the paper Joe Schmoe

6  committed a serious crime, but he was sentenced to ten years,

7  20 years, 30 years, depends on the crime, that really says to

8  me that what I've always believed is right has been vindicated,

9  this is not a universe of chance and good and bad fortune.  It

10 is a universe or at least a nation of laws in which what is

11 right and true and just will be vindicated and what is bad and

12 wrong and evil will be punished, but that so easily can slip

13 into failing to take account of the human being who is bearing

14 the full brunt of that construction, that great moral

15 development that is all being thrown at him or her.  And so you

16 have the situation where we now have 2.2 million people in

17 prison in this country, vastly in excess of any other country

18 in the world, and vastly in excess of where the United States

19 stood in, say, 1950 when there were 700,000 people in prison.

20 So I share, like all Americans, the desire to see justice

21 vindicated, but I worry that it has to be tempered with

22 consideration that we are all human beings and all of us share

23 characteristics with every defendant who comes before this

24 Court.

25           With all those bromides out of the way, let me hear

EcjWshrS

further from you.

MR. TURNER:  Your Honor, obviously there are many factors that go into sentencing and for your Honor to balance. It's not an enviable task, but nonetheless no one is talking about here imposing some sort of sentence that would not be just for the defendant just in order to send some message. I've already discussed, I think, that this crime was a serious one in and of itself.  I've already discussed how the defendant knew what he was doing, he knew what he was doing was wrong.  I think, though, clearly, as your Honor pointed out, an additional factor that Congress thinks is important and the courts typically think is important is the interest of deterrence, and I think the interests of deterrence are especially implicated here for a couple of reasons.

First, this is not a crime that is easily detectable. As much as defense counsel talked about now the bitcoin community knows the government is watching, it is not easy to watch for this sort of activity.  Compliance typically happens behind the scenes.  The government doesn't have the resources to do a lot of audits of these companies and a lot of it's going to be missed.  We backed into this case the way, the investigation was done.  We happened to find that not only BTCKing was committing crime, but the people he was dealing with at BitInstant were, so it's not an easy crime to detect. So when crimes like this are detected, it is important that the

EcjWshrS

message goes out that they come with consequences.

Beyond that, you have the special context of the digital currency business.  This is a growing area.  It's an area that the federal government has serious money-laundering concerns about.  Obviously, bitcoin has legitimate uses, nobody's disputing that, but it also has serious money-laundering risks.  These businesses, digital currency exchange businesses, are one of the few areas where the government can get a hold on in order to impose some sort of money-laundering controls, and have a lookout through which to spot suspicious activity.  And unless those businesses get the message that these laws are not a joke, they're not a suggestion, but they're laws that you must comply with or else they come with consequences, then I think this Court will miss a valuable opportunity to help promote the legitimacy of that industry.

I think a sentence like probation, that will be viewed as a slap on the wrist.  I think something like forfeiture, that will be viewed as a slap on the wrist.  I think there needs to be a substantial prison sentence here.  What that sentence should be, I defer to your Honor.  But I think it needs to be a substantial prison sentence as opposed to the collateral consequences.

THE COURT:  I'm interested, and I agree with you that forfeiture in some ways would be viewed as a slap on the wrist,

EcjWshrS

which makes you wonder why the federal government insists on

just bringing certain kinds of cases against companies as

opposed to individuals, but that's a different debate.

          Anything else you wanted to say?

          MR. TURNER:  I think that's it, your Honor, unless you

have further questions.

          THE COURT:  All right.

          MR. TURNER:  Thank you.

          THE COURT:  Let me hear from Mr. Shrem if he wishes

to.

          THE DEFENDANT:  I screwed up really bad, your Honor.

My attorney and Mr. Turner were correct in saying that I was

given a responsibility and I failed myself and my community, my

family and the bitcoin community as a whole.  You know, you see

the movie Spiderman when you are younger and one of the only

quotes that you kind of remember from that is with great power

comes great responsibility, and I always would watch that and

said what does that mean, when you have great power, where does

that come from.  And I guess the answer is that when you're

in --

          THE COURT:  I think it comes from Marvel Comics, if I

remember correctly.

          THE DEFENDANT:  When you're in a powerful position,

when you're in a position of power, it's a lot harder to stay

responsible to yourself and stay morally responsible.  It's a

EcjWshrS

lot easier when there's nothing riding on you.  And I failed

that.  I was very young.  I was 22, and Mr. Turner pointed out

that I was the CEO and I was the compliance officer.  I was

actually the only employee of the company at the time; it was

just me and my partner running this out of our basement.  And

the actions stopped before I founded the Bitcoin Foundation and

before I worked with Homeland Security and the D.A.'s office.

I knew what I was doing was wrong and given the opportunity it

stopped, and it was over two or three years ago, to a point

where the company grew, 25 people, and we had a great company

and doing great things.  And eventually FinCEN came out with

regulations and we looked at ourselves and we said the area's

so gray, we should stop, and we actually shut down the company

almost a year before I was arrested.

      And so I screwed up really bad and I realized that a

long time ago, and I tried really hard and suffered greatly to

wrong those rights and to work with the government, teaching

them how to actually take down these bad guys, working with

them out of my own will, wanting to help, after I had already

stopped doing the negative things because I knew what kind of

negative things were actually going on.  And I wanted to help

anyone.  They would come to my office, I'd go to their office,

in addition to various subpoenas that we got, out of my own

will, and I felt really bad for what I did.  And I went and I

started the Bitcoin Foundation and we grew that, and the

1    foundation is working with companies to be much better

2    compliant, and I tried really hard and we instituted tons of

3    policies to make sure that no other customers can do this, and

4    I have no excuses for what I did.

5         I broke the law and I broke it badly, and I'm really

6    sorry for doing that, and I'm sorry for failing you and failing

7    this country, but I cherish so much and I want to change the

8    world and I'm trying to.  From the letters that you've read, I

9    help people get jobs, all my former employees, I would go out

10   and find them jobs and I would do charitable things since I was

11   a kid.  I want to be that person that is remembered for even

12   doing one little thing to change the world, and the way I grew

13   up, in my head, the way my brain operates is that I think ten

14   steps ahead and I say I want to be there.  And along the way I

15   make mistakes and I don't think about how my actions affect

16   other people.  While I'm going through, I'm just kind of a

17   snowplow, plowing through.

18        When I was arrested, I was a very immature kid.  I

19   was.  And I've suffered greatly from this.  I've lost the

20   respect of many people in the community, my community and the

21   bitcoin community.  I've been under house arrest for a year and

22   suffered various psychological effects.  I've, I have very

23   severed relationships with family and friends all because of

24   this.  It's all my fault.  I screwed up, and the bitcoin

25   community, trust me, they are scared.  They saw what happened

EcjWshrS

1    to a guy like me that was on top of the world and got arrested

2    at the airport.  No one is doing this anymore.  There is no

3    money laundering going on in the bitcoin space.  They're

4    terrified.  There are Senate hearings.  All of the bitcoin

5    community is working so closely.  I helped the New York State

6    department of financial services to create what's now known as

7    the bit license that they're coming out with to allow bitcoin

8    companies to be regulated.  I sat in the office of Cory Jacobs

9    and Dana Syracuse and with a whiteboard explained to them how

10   bitcoin works.  Years ago, when maybe ten people in the world

11   knew what bitcoin was.

12            Because my lawyer, my attorney is right, bitcoin needs

13   to stay away from criminals, bitcoin needs to stay away from

14   people and actions that I did.  Bitcoin needs to stay away from

15   that and I need to be out there making sure that it doesn't go

16   back to that because bitcoin is my baby.  Bitcoin is what I

17   love and all I have.  It's my whole life.  It's what I'm on

18   this earth to do, is to help the world see a financial system

19   that does not discriminate and provide for corruption, and I

20   think that bitcoin will do to money what e-mail did to the

21   postal service.  It allowed everyone to be equal.  People in

22   Africa, the Middle East, Asia, will have the same opportunities

23   now with bitcoin, and because of this now, because you can move

24   money instantly and information on a peer-to-peer system.  And

25   I think that's really important.  And if your Honor grants me

EcjWshrS

1       that, I'd love to be back out there helping the world and

2       making sure people don't do stupid things like I did.  I'm

3       sorry again.

4              THE COURT:  Thank you very much.  It is almost a

5       platitude for any judge to say that the most difficult thing

6       that he or she does is impose sentence, but that is certainly

7       true in this as in so many other cases.  This Court has never

8       taken refuge in the easy way out of simply applying the

9       guidelines, because I am convinced, and this case is a classic

10      example of how totally arbitrary and irrational the guidelines

11      system is.  The guidelines system takes no meaningful account

12      of the human being.  The guidelines system really takes no

13      account of anything except the need to apply numbers chosen out

14      of whim to an arithmetic grid and make that the substitute for

15      justice.  I mention that only because it means that if you look

16      beyond the guidelines, as I hope every judge will do, you are

17      then left with the classic but no less forbidding job of trying

18      to figure out on the merits what is the right sentence for

19      someone, a fellow human being, who has nevertheless committed a

20      serious, antisocial crime.

21             We are fortunate, other judges and me, that we have

22      some general guidance in Section 3553 of Title 18 of the

23      criminal code, a statute that, unlike the guidelines, has the

24      good sense to express Congress's general policies that all

25      judges must, therefore, faithfully carry out, but not to try to

1    calibrate how those policies can be worked out in the

2    multifaceted circumstances of any given case.  What that

3    section says, among other things, is that the sentence must be

4    sufficient to fulfill the various functions that Congress has

5    assigned to sentencing, including general deterrence, specific

6    deterrence, reflecting the seriousness of the crime and the

7    social harm it imposes, but also that it should be no more than

8    necessary to carry out those functions.

9             So how does one determine what is necessary?  The

10   guide here, as it has been for judges in the common law system

11   for literally centuries, has to be experience.  It can't be

12   abstractions.  It cannot place ideology or sociology above just

13   the minutiae of the facts, the nitty-gritty of what has

14   occurred and what experience suggests is the prognosis for the

15   future.  On the one hand, this means that the guideline range

16   and the suggested sentence by probation of 57 months, which was

17   simply the bottom of the guidelines, would be absurd.  But, on

18   the other hand, probation would not even begin to fulfill the

19   functions mandated upon this Court by Section 3553.

20            It's hard not to have sympathy in many ways for

21   Mr. Shrem, a highly intelligent person.  He has, as even his

22   few words a few minutes ago indicated, the arrogance of youth

23   that has both positive and negative qualities.  It inspires

24   idealism; it disregards the need to be cognizant of society's

25   strictures.  I'm not sure that it's a good philosophy for

anyone of the age of 25 or so to undertake to save the world,
something quite a bit more modest might be more appropriate.
But the point I'm trying to make is that there's no doubt in my
mind that Mr. Shrem was a very immature person at the time he
committed this crime.  Counsel used the word "puerile," which
at least shows that he has good training in Latin, but I think
the more common word is immature, immature and impulsive, but
not to the point that can be excused.

         This was not some kid making a one-time mistake, some
act truly aberrational, taken in a moment of impulsivity or
just plain stupid.  There's no question that Mr. Shrem, over a
period of many months, was knowingly, willfully and to some
extent excitedly, even passionately, involved in activity that
he knew that, in part, was a serious violation of the law and
that was promoting the evil business of trafficking in drugs.
And it's hard to escape on the evidence in this case a feeling
that that was part of the immense excitement he felt from being
one of the originators of bitcoin.  It went with the territory,
at least in an emotional sense.  And this was true even though
there are so many things about Mr. Shrem that are laudable,
that are reflected in the very fine letters that the Court has
received, and there are deeper aspects which I don't feel
competent to get into or make part of my sentencing
consideration, but his very equivocal relationship with his
family and background that made him both want to be part of it

EcjWshrS

and to get out of it, not an unheard-of situation for a young

person, but one that in this case was carried to extremes.  He

had a confidence expressed even here today in his ability to

think ten steps ahead, and certainly as someone who, like most

folks, can barely think one step ahead, I admire his brain

power, but it also betokened a lack of respect for those less

confident, less brilliant, but perhaps more law-abiding than he

was.

          I don't want to dwell further though on Mr. Shrem

other than to say that no sentence imposed by this Court should

be of such length that it really destroys the man or fails to

take account of his positive qualities.

          Moving to some of the other factors under Section

3553, I think the government is quite right that, first, this

was a serious crime and that it, regardless of whether it was

addressed to the buyer or the seller or to only certain aspects

of the economic activity of drug distribution, nevertheless

clearly was contributing to drug trafficking overall, and the

very innovativeness made it a danger to the ever-continuing

battle to control drug trafficking; and, secondly, that the

very innovativeness of the situation has to be taken account of

from a deterrence standpoint.  Every case has to be treated on

its own facts, and the fact that this is a case where the

Court's sentence will be communicated to others in the milieu

in which Mr. Shrem was operating cannot be ignored.

EcjWshrS

1          Putting all those factors, as well as all the other

2    facts under Section 3553(a), which the Court has considered,

3    into the equation, the Court thinks that the appropriate

4    sentence is two years.  Accordingly, the defendant will be

5    sentenced to two years in prison, 24 months.  That is to be

6    followed by three years of supervised release on terms that

7    I'll get to in a minute.

8          No fine will be imposed because of the very

9    substantial forfeiture that has already been agreed to,

10   although there is a $100 mandatory assessment that must be

11   paid.

12         Now, the terms of supervised release will include the

13   mandatory conditions that the defendant shall not commit any

14   other federal, state, or local crime; that the defendant shall

15   not illegally possess a controlled substance; that the

16   defendant shall not possess a firearm or destructive device;

17   that the defendant shall cooperate in the collection of DNA;

18   and that the defendant shall submit to one drug test within 15

19   days of his placement on supervised release, to be followed by

20   two drug tests thereafter, as directed by the probation

21   officer.

22         There will also be imposed the standard conditions one

23   through 13.  They will appear on the face of the judgment and

24   will be gone over with the defendant by the probation officer

25   when he reports for the beginning of his period of supervised

EcjWshrS

1   release.

2          Finally, there are the special conditions:  First,

3   that the defendant is to report to the nearest probation office

4   within 72 hours of his release from custody; and, second, that

5   he will be supervised by the district of his residence.

6          Now, before I advise the defendant of his right of

7   appeal, and we also need to talk about whether he should be

8   remanded or we should release him pending surrender, and if so

9   on what date, let me find out if there is anything else

10   regarding the sentence that the Court has just imposed that

11   either party needs to raise.

12          MR. TURNER:  Forgive me, your Honor, if you already

13   covered this.  I know you asked at the beginning whether the

14   parties had any objection to the guidelines calculation in the

15   PSR, but I'm not sure I heard your Honor ask if either party

16   had any factual objection to anything in the PSR.

17          THE COURT:  To the facts set forth in the presentence

18   report?

19          MR. TURNER:  Yes.

20          THE COURT:  I don't usually do that because in a case

21   like this where I've received very detailed submissions from

22   both parties setting forth the facts in much more detail than

23   the probation officer usually has, I'm aware if there were any

24   disagreements and then I ask about those specifically.  I

25   didn't see any disagreements.  There were huge disagreements on

EcjWshrS

1  the significance of the facts, but I didn't see any

2  disagreement on the facts.  Did you see any?

3           MR. TURNER:  No, your Honor.

4           MR. AGNIFILO:  Nor did I.

5           THE COURT:  Very good.  Let's talk then about

6  surrender.  What's the government's position?

7           MR. TURNER:  I'd be fine with 90 days, your Honor.

8           THE COURT:  All right.  Very good.  I assume that's

9  agreeable to the defense.

10          MR. AGNIFILO:  Yes.  Yes, your Honor.

11          THE COURT:  It December 19, so that would be

12  approximately the middle of March.  There are Jewish holidays

13  around then.  Does anyone know whether we need to take those

14  into account?

15          MR. AGNIFILO:  Our only request would be that it be a

16  Monday.

17          THE COURT:  Okay.  Why don't we say Monday, March 16,

18  at 2 p.m.

19          MR. AGNIFILO:  That's fine, your Honor.

20          THE COURT:  At the designated institution.

21          MR. AGNIFILO:  Would your Honor be comfortable

22  suggesting Otisville?

23          THE COURT:  Sorry?

24          MR. AGNIFILO:  Would your Honor be comfortable

25  recommending that the Bureau of Prisons consider Otisville?

EcjWshrS

1              THE COURT:  Yes, I'm perfectly happy to recommend

2       that.  As I'm sure you've told your client, these days those

3       recommendations are oft not followed because of prison

4       overcrowding, but I'm certainly happy to recommend it.

5              Mr. Shrem, you have a right to appeal the sentence.

6       Do you understand that?

7              THE DEFENDANT:  I do, your Honor.

8              THE COURT:  If you can't afford counsel for any such

9       appeal, the Court will provide one for you free of charge.  Do

10      you understand that?

11             THE DEFENDANT:  I do, your Honor.

12             THE COURT:  Very good.

13             MR. TURNER:  Your Honor, the original indictment, the

14      charges should be dismissed.

15             THE COURT:  Oh, yes.  Thank you very much.  That's

16      granted.

17                              o0o

18

19

20

21

22

23

24

25